UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

No. 14-2581-Otazo-Reyes

UNITED STATES OF AMERICA

vs.

GUILLERMO DELGADO and
GABRIEL DELGADO,

Defendants.
_____/

CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to October 14, 2003?      ____ Yes   _X_ No

2. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to September 1, 2007?      ____ Yes   _X_ No

Respectfully submitted,

WIFREDO A. FERRER
UNITED STATES ATTORNEY

BY: /s/ Allan Medina
Allan Medina
Trial Attorney
Special FL Bar No. A5501748
United States Department of Justice
Criminal Division, Fraud Section
1400 New York Avenue, N.W.
Washington, D.C. 20005
Telephone: 202-257-6537
Fax: 202-514-6118
E-Mail: Allan.Medina@usdoj.gov

# UNITED STATES DISTRICT COURT
for the

Southern District of Florida

| | |
|---|---|
| United States of America<br>v.<br><br>GUILLERMO DELGADO and<br>GABRIEL DELGADO<br><br>*Defendant(s)* | )<br>)<br>)  Case No. 14-2581-Otazo-Reyes<br>)<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of  Jan. 2006 through Sept. 6, 2012  in the county of  Miami-Dade  in the Southern District of  Florida , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 371 | The defendants did knowingly and willfully combine, conspire, confederate and agree with each other and with other persons to commit offenses against the United States, that is to defraud the United States and violate Title 42, United States Code, Section 1320a-7b(b). |
| 18 U.S.C. § 1956(h) | The defendants did knowingly combine, conspire, and agree with each other and with other persons, to commit offenses against the United States, that is to violate Title 18, United States Code, Sections 1956(a)(3) and 1957. |

This criminal complaint is based on these facts:

☑ Continued on the attached sheet.

*Complainant's signature*

Henry Luna, Special Agent, HHS-OIG
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 05/09/2014

*Judge's signature*

City and state:  Miami, Florida   The Hon. Alicia M. Otazo-Reyes
*Printed name and title*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 14-2581-Otazo-Reyes

UNITED STATES OF AMERICA

vs.

GUILLERMO DELGADO and
GABRIEL DELGADO,

     Defendants.
_____/

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

Your affiant, Henry Luna, being duly sworn, deposes and says:

### A. Identity and Experience of the Affiant

1. I am a Special Agent with the United States Department of Health and Human Services – Office of Inspector General (HHS-OIG). Since January 2011, I have been assigned to the HHS-OIG Miami Regional Office located in Miami Lakes, Florida. As a Special Agent with the HHS-OIG, I am responsible for investigating violations of United States federal law, including, but not limited to Title 18, United States Code, Section 1347 (Health Care Fraud), Title 18, United States Code, Section 1349 (Conspiracy to Commit Health Care Fraud), Title 18, United States Code, Section 371 (Conspiracy to Pay and Receive Kickbacks), Title 18, United States Code, Section 1956 (Money Laundering), Title 31, United States Code, Section 3124 (Structuring Transactions) and Title 42, United States Code, Section 1320a-7b(b) (Paying and Receiving Kickbacks). I have participated in

1

numerous health care fraud investigations and have received training in the investigation of financial crimes.

2. Prior to joining the Department of Health and Human Services, I was employed by the Internal Revenue Service – Criminal Investigation Division (IRS-CID) as a Special Agent. As a Special Agent with IRS-CID, my responsibilities included, among other things, effecting asset forfeitures; analyzing voluminous bank records and other financial records; preparing comprehensive reports, which were used to recommend prosecutions for various violations of United States federal laws; overseeing undercover operations; and testifying in grand jury and open court.

3. This Affidavit is written in support of a criminal complaint charging GUILLERMO DELGADO (hereinafter referred to as "Guillermo Delgado") and GABRIEL DELGADO (hereinafter referred to as "Gabriel Delgado") (also collectively referred to as the "Delgado Brothers"), with Conspiracy to Defraud the United States and Receive Kickbacks in violation of Title 18, United States Code, Section 371, Receipt of Kickbacks in Connection with a Federal Health Care Program in violation of Title 42, United States Code, Section 1320a-7b(b), and Conspiracy to Commit Money Laundering in violation of Title 18, United States Code, Section 1956(h). This Affidavit does not contain all the facts of this investigation that I am aware of, but only those necessary to establish probable cause.

**B. The Medicare Program**

4. Medicare is a federal health care program providing benefits to persons who are the age of 65 or older or disabled. Medicare is administrered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of

Health and Human Services. Individuals who receive benefits under Medicare are referred to as Medicare "beneficiaries."

5. Medicare is a "health care benefit program" as defined by Title 18, United States Code, Section 24(b) and referenced in Title 18, United States Code, Section 1347.

6. Medicare is subdivided into multiple parts. Prescription drug coverage is provided through Medicare Part D, which covers the cost of most prescription drugs for Medicare beneficiaries. Part D of the Medicare program was enacted as part of the Medicare Prescription Drug, Improvement and Modernization Act of 2003.

7. Part D provides coverage for Medicare beneficiaries for prescription drugs, and it is administered by private insurance plans that are reimbursed by Medicare through CMS. Part D subsidizes the costs of prescription drugs by prospectively paying private insurers on a monthly basis to provide benefits to Medicare beneficiaries.

8. Medicare beneficiaries can obtain Part D benefits in two ways: (1) by joining a Prescription Drug Plan, which covers only prescription drugs, or (2) by joining a Medicare advantage plan, which covers both prescription drugs and medical services, (collectively, "Part C plans").

9. Under Part D, a pharmacy can contract with multiple Part D plans or their Pharmacy Benefit Managers ("PBMs"), which provide Medicare Part D coverage. A pharmacy also can submit claims for payment to a Part D plan with which it does not have a contract. Under either arrangement, the pharmacy submits claims for prescriptions filled for Medicare Part D beneficiaries.

10. Most Part D plans contract with a PBM to administer processing and payment of prescription drug claims. Further, pharmacies typically contract with the Part D plans'

PBMs either directly or through a third-party administrator often referred to as a Pharmacy Services Administrative Organization ("PSAO").

11. Typically, a Medicare beneficiary enrolled in a Medicare Part D plan obtains their prescription medications from a pharmacy authorized by the Medicare beneficiary's Part D plan. After filling a Medicare beneficiary's prescription, the pharmacy then submits the prescription drug claim to a Part D Plan or PBM for payment under the beneficiary's Health Insurance Claim Number and/or Medicare Plan Identification Number. Then, the Part D Plan or PBM sends a reimbursement check to the pharmacy or initiates an electronic transfer of funds to the pharmacy's bank account.

12. Each Part D Plan submits to CMS a record of each prescription drug claim it receives from a pharmacy. CMS contracts with Medicare Administrative Contractors ("MACs") to process claims for the payment. The MAC that processes and pays Medicare Part D claims in Florida is Palmetto Government Benefits Administrators, LLC ("Palmetto").

13. A Medicare claim for payment is required to set forth, among other things, the following: the beneficiary's name and unique Medicare identification number; the item or service provided; the cost of the item or service; and the name and Unique Physician Identification Number ("UPIN") and/or the National Provider Identifier ("NPI") of the physician who prescribed or ordered the item or service.

14. Under federal regulations, Part D plans must ensure that pharmacies submitting prescription drug claims for reimbursement under Part D are contractually required to maintain records for 10 years. In addition, federal regulations require all pharmacies to maintain documentation for seven years from the date of service. The documentation that

must be maintained includes written and electronic documents relating to written orders and requests for payments.

### C. The Medicaid Program

15. Medicaid is a partnership between the states and the federal government, with each paying about half the cost. Each state operates its own Medicaid program under a state plan that must be approved by CMS. The plan outlines current Medicaid eligibility standards, policies and reimbursement methodologies to ensure the state program receives matching federal funds.

16. In Florida, the Agency for Health Care Administration ("ACHA") is responsible for Medicaid.

17. Although pharmacy coverage is an optional benefit under federal Medicaid law, all states currently provide coverage for outpatient prescription drugs to all categorically eligible individuals and most other enrollees within their Medicaid programs.

### D. The Delgado Brothers and Their Criminal Activity

18. Your affiant has been part of an investigative team that has been investigating the Delgado Brothers for committing various health care related offenses. The statements in this affidavit are based upon information I learned during the investigation, including, but not limited to information provided by cooperating witnesses, public source and business records, bank records and my experience and background as a HHS-OIG Special Agent.

19. During the course of this investigation, agents have interviewed a number of associates of the Delgado Brothers who have pled guilty to criminal charges and have described fraudulent practices that were committed by the Delgado Brothers. In general, these former affiliates stated kickbacks and bribes were routinely paid to the Delgado Brothers

in exchange for providing Medicare beneficiaries to pharmacies, Community Mental Health Centers ("CMHCs") and Home Health Agencies ("HHAs"). In addition, affiliates described routinely laundering money for the Delgado Brothers, so that the Delgado Brothers themselves could pay kickbacks and bribes to both doctors, for prescriptions, and patient recruiters, who would provide patients to medical clinics, Assisted Living Facilities ("ALFs"), and HHAs that the Delgado Brothers owned and controlled. While there are a number of individuals who have pled guilty to health care related and other related offenses, for purposes of establishing probable cause, this Affidavit will focus on the statements of two (2) separate co-conspirators who have pled guilty to charges of conspiracy to commit health care fraud.

**E. Cooperating Witness 1**

    **i) Kickback Scheme**

20. Based on information supplied by cooperating witnesses, and confirmed in documentary evidence obtained by law enforcement, the Delgado Brothers are engaged in a widespread scheme to receive illegal health care kickbacks from Medicare providers. In return, the Delgado Brothers provide Medicare providers with Medicare and Medicaid elegible beneficiaries and other identifiying information belonging to these Medicare and Medicaid beneficiaries. These beneficiaries are residents of ALFs that the Delgado Brothers own and control. Medicare and Medicaid providers then used the beneficiary information to submit fraudulent claims to Medicare and Medicaid on their behalf.

21. The first cooperating witness ("CW1"), a former owner of a Miami-based pharmacy, Morales Pharmacy, explained that he paid the Delgado Brothers approximately $18,000 per month in exchange for the Delgado Brothers sending patients to CW1's pharmacy

from various ALFs that the Delgado Brothers owned and/or controlled. CW1 would write checks to the Delgado Brothers or companies they owned and controlled through his pharmacy business accounts.

22. CW1 explained that his agreement with the Delgado Brothers began in approximately 2006. CW1 spoke directly with Guillermo and Gabriel Delgado to form this kickback partnership. In 2007, CW1 stated that as part of this illicit arrangement, and in an effort to hide its true nature, CW1 and the Delgado Brothers entered into "marketing and consulting services" contracts. In the contract, CW1 agreed to pay $18,000 monthly divided into two "bi-monthly" payments of $9,000. According to CW1, this contract was created merely to conceal the kickback payments made from CW1 to the Delgado Brothers and the Delgado Brothers never provided any "marketing or consulting services" to CW1's pharmacy other than selling patients to him from ALFs. CW1 stated that the Deglado Brothers sold him approximately 400-500 patients per month.

23. The Delgado Brothers, their employees, and/or relatives would pick up bi-monthly kickback payments from CW1's management office and/or pharmacies. Using information from Medicare beneficiaries obtained through the payment of illegal health care kickbacks by CW1 to the Delgado Brothers, CW1's pharmacy submitted claims to the Medicare Part D program for reimbursement for pharmaceuticals. The bases for these claims to Medicare were the beneficiaries who resided in ALFs that the Delgado Brothers owned and controlled and who were sold to CW1.

    **ii.    Money Laundering**

24. As part of the kickback arrangement, the Delgado Brothers instructed CW1 to make the kickback checks payable to two "shell" companies. The first company was Diversified

Investment Group of Miami, Inc. ("Diversified Investment"), which is a Florida corporation, incorporated on or about January 28, 2002. In the incorporation documents filed with the Florida Department of State, Guillermo Delgado listed himself as President, Vice-President, Secretary, and Treasurer. When Diversified Investment was incorporated, the physical address listed for Diversified Investment was 1455 NW 14th Street Miami, FL 33125. By 2012, Guillermo Delgado listed 10021 SW 80th Avenue Miami, FL, 33156, his personal residence, as Diversified Investment's physical address. Analysis of the bank records established that from in or around March 2006 through in or around October 2009, CW1 paid approximately $750,000 dollars in kickbacks and bribes to the Delgado Brothers through Diversified Investment. Law enforcement is in possession of these checks.

25. The second shell company that the Delgado Brothers directed CW1 to endorse kickback payment checks to was Preferred Providers Group, Inc. ("Preferred Providers"). Preferred Providers is a Florida corporation, which was incorporated on or about May 29, 1999. At the end of 2000, Gabriel Delgado listed himself as the Director and Registered Agent of Preferred Providers. By January 2006, Gabriel Delgado listed 8235 SW 92th Street Miami, FL 33156, his personal residence, as Preferred Providers' address. Analysis of the bank records established that from in or around October 2009 through in or around September 2012, CW1 paid approximately $800,000 dollars in kickbacks and bribes to the Delgado Brothers through Preferred Providers. Law enforcement is in possession of these checks.

26. CW1 explained that these companies, Diversified Investment and Preferred Providers, were used by CW1 and the Delgado Brothers to facilitate and conceal the kickback

scheme. Violations of the Anti-kickback Statute became a specified unlawful activity for money laundering purposes after March 2010. Approximately 59 checks totaling more than $672,100 were written by CW1 to the shell entity Preferred Providers between April 2010 to September 2012.

27. An analysis of CW1's banking shows checks written in $9,000 and $11,500 increments, totaling between $18,000 and $23,000 per month, were issued by CW1 to both companies owned and controlled by the Delgado Brothers. From in or around March 2006 through in or around September 2012, CW1 paid the Delgado Brothers approximately $1.5 million dollars in kickback payments in exchange for the Delgado Brothers providing 1,000s of patients to CW1's pharmacy.

### F. Cooperating Witness 2

28. During the course of the investigation, Federal agents also interviewed cooperating witness 2 ("CW2"). CW2 explained that he has known the Delgado Brothers for several years. CW2 stated that the Delgado Brothers owned and/or controlled several ALFs. Through these ALFs, CW2 explained that the Delgado Brothers would sell these patients to pharmacies, CMHCs and HHAs in exchange for kickbacks and bribes.

29. CW2 had agreements with the Delgado Brothers to pay them illegal kickbacks in exchange for the Delgado Brothers providing him access to Medicare patients that the Delgado Brothers controlled. CW2 would then sell these patients himself to Medicare providers in exchange for kickbacks and bribes.

30. The Delgado Brothers introduced CW2 to CW1. CW2 learned that CW1 owned a pharmacy, Morales Pharmacy. Guillermo Delgado told CW2 that CW1 laundered money for him and his brother, Gabriel Delgado. At the time, CW2 also worked at Company A,

a home health agency, which was co-owned by Guillermo Delgado. Company A was also co-owned by Co-conspirator A. At this company, CW2 worked directly with the Delgado Brothers to bring in more patients to Company A, so that they could be billed for purported home health services. CW2 explained that it was Company A that Guillermo Delgado would use to facilitate the money laundering scheme with CW1.

31. CW2 stated that Guillermo Delgado would write checks from Company A business accounts to CW1. CW1 would then cash the checks and provide the cash to Guillermo Delgado. On many occasions while working at Company A, on behalf of Guillermo Delgado, CW2 would instruct Co-conspirator A to issue checks from the Company A accounts to CW1 in order to have the money laundered for Guillermo Delgado.

32. Guillermo Delgado told CW2 that the cash was used to pay kickbacks to a doctor for patient referrals and prescriptions.

**G. Financial Analysis**

33. During the course of the investigation, Federal agents obtained the Medicare and Medicaid claims data for Morales Pharmacy. An analysis of that data revealed that from in or around March 2006 through in or around December 2012, Morales Pharmacy submitted $23 million in false and fraudulent claims to Medicare and Florida Medicaid. Each of these claims was affiliated with beneficiaries residing in ALFs that the Delgado Brothers owned and controlled. Medicare and Florida Medicaid paid approximately $23 million to CW1 and Morales pharmacy for those claims.

34. Your affiant also believes he has probable cause that the defendants did knowingly and willfully combine, conspire, confederate and agree with each other and to commit an offense against the United States, that is to violate Title 42, United States Code, Section

1320a-7b(b) by knowingly and willfully soliciting and receiving any remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, to a person to induce such person to refer an individual to a person for the furnishing and arranging for the furnishing of an item and service for which payment may be made in whole and in part by a Federal health care program, that is, Medicare, in violation of Title 18, United States Code, Section 371. Your affiant also believes he has probable cause that the defendants did knowingly combine, conspire, and agree with each other and with other persons, to commit offenses against the United States, that is, to knowingly conduct a financial transaction affecting interstate and foreign commerce, which financial transaction involved the proceeds of specified unlawful activity, knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, and knowing that the transaction was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(3); and to knowingly engage in a monetary transaction by, through, and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, such property having been derived from specified unlawful activity, in violation of Title 18, United States Code, Section 1957.

The specified unlawful activity is conspiracy to commit health care fraud in violation of Title 18, United States Code, Section 371.

_____
HENRY LUNA
Special Agent
United States Department of Health and Human Services

Subscribed and sworn to before me on this 9th day of May, 2014

_____
THE HON. ALICIA M. OTAZO-REYES
UNITED STATES MAGISTRATE JUDGE